21-2582-pr
*Jimenez v. Stanford*

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2022

Argued: April 27, 2023     Decided: March 12, 2024

Docket No. 21-2582-pr

RAFAEL JIMENEZ,

*Petitioner-Appellant,*

— v. —

TINA M. STANFORD, CHAIRPERSON OF THE NEW YORK STATE BOARD OF PAROLE,

*Respondent-Appellee.*<sup>*</sup>

B e f o r e:

CABRANES, LYNCH, and LOHIER, *Circuit Judges.*

Petitioner Rafael Jimenez appeals from a judgment of the United States

---

<sup>*</sup> The Clerk of Court is directed to amend the caption as set forth above.

District Court for the Southern District of New York (Nathan, *J.*) denying his petition for a writ of habeas corpus. A New York jury found Jimenez guilty of murder after a trial in which the State's case-in-chief relied on the testimony of two eyewitnesses. But two decades later, one eyewitness recanted and claimed that a police detective improperly influenced his identification. Two alibi witnesses also came forward. A State court denied post-conviction relief, and Jimenez petitioned for a writ of habeas corpus, claiming actual innocence and *Brady* violations. The district court found that Jimenez had cast enough doubt on his guilt to excuse his untimely petition, but ultimately denied relief on the merits.

Jimenez argues on appeal that the district court erroneously deferred to the State court's conclusions, held his actual innocence claim to an impossibly high standard, and contravened factual findings made following an evidentiary hearing. His arguments rely on two unsettled legal premises: that a freestanding claim of actual innocence is constitutionally cognizable and may be established by clear and convincing evidence, and that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to claims of actual innocence. We assume without deciding that freestanding innocence claims are cognizable. We conclude, however, that AEDPA applies to such claims, and that the district court could not have granted habeas relief under the facts presented in this case because Jimenez's newly discovered evidence does not satisfy the substantially higher standard of proof required to prove actual innocence. We further conclude that there is no merit to Jimenez's *Brady* claim. We therefore AFFIRM the district court's judgment denying habeas relief.

Judge Cabranes concurs in the judgment in a separate opinion.

———————

GLENN A. GARBER (Rebecca E. Freedman, *on the brief*), The Exoneration Initiative, New York, NY, *for Petitioner-Appellant*.

MATTHEW B. WHITE, Assistant District Attorney (David M. Cohn, Assistant District Attorney, *on the brief*), for Darcel D. Clark, District Attorney, Bronx County, Bronx, NY, *for Respondent-Appellee*.

Parvin D. Moyne and Andrew A. McWhorter, Akin Gump Strauss Hauer & Feld LLP, New York, NY; Juliana C. DeVries and Zara H. Shore, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, *for Amici Curiae* Centurion Ministries, The National Association of Criminal Defense Lawyers, The New York State Association of Criminal Defense Lawyers, The Center for Appellate Litigation, and The Legal Aid Society, *in support of Petitioner-Appellant.*

———————

GERARD E. LYNCH, *Circuit Judge*:

This is a troubling case about a weakly supported thirty-year-old murder conviction that may have condemned an innocent teenager to decades in prison. It is troubling because, despite our considerable doubt regarding the petitioner's guilt, we are bound to conclude that he is not entitled to a writ of habeas corpus based only on the contention that he is, in fact, innocent.

Petitioner-Appellant Rafael Jimenez appeals from a judgment entered on September 15, 2021, in the United States District Court for the Southern District of New York (Alison J. Nathan, *J.*), denying a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his New York State conviction for second degree murder in the 1992 shooting of Michael Brana. The prosecution's case-in-chief relied on identifications by two eyewitnesses to prove Jimenez's guilt. Then,

3

almost twenty years after the trial, one eyewitness recanted his testimony and claimed that the investigating detective had fed him misleading information that improperly influenced his courtroom identification of Jimenez. Two alibi witnesses, who had not testified at trial, also came forward. Jimenez sought relief from his conviction, claiming that he is factually innocent and that a *Brady*/witness tampering violation tainted the fairness of his trial.

Despite the thin remaining evidence of his guilt, a State court declined to hold an evidentiary hearing and denied post-conviction relief on the ground that Jimenez had not proven his innocence, in large part because the court did not believe the recanting eyewitness or the alibi witnesses. *People v. Jimenez* ("*Jimenez I*"), No. 7631/92, 2015 WL 770457, at *5-12 (N.Y. Sup. Ct. Feb. 13, 2015). Jimenez next filed an untimely petition for a writ of habeas corpus. After a magistrate judge held an evidentiary hearing at which Jimenez's witnesses testified (the "gateway innocence hearing"), the district court entered findings that partially contravened the State court's decision, concluding that Jimenez had presented a sufficiently credible and compelling case of actual innocence to excuse the untimeliness of the petition. *Jimenez v. Lilley* ("*Jimenez II*"), No. 16cv8545(AJN)(RWL), 2018 WL 2768644, at *1 (S.D.N.Y. June 7, 2018).

But when the district court reached the merits of Jimenez's claims, it

4

denied his petition for a writ of habeas corpus. *Jimenez v. Stanford* ("*Jimenez III*"), 560 F. Supp. 3d 761, 764 (S.D.N.Y. 2021). It chiefly ruled that, although Jimenez's new exculpatory evidence was compelling enough to meet a high standard of proof for the purpose of excusing a procedural default, the same body of evidence did not meet the even higher standard required for freestanding claims of actual innocence and to overcome the deference to State court decisions mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). *Id.* at 771-72.

Jimenez raises numerous objections on appeal. Most are addressed to the extraordinarily high hurdles set before freestanding innocence claims, including the central problem that to date no federal court has recognized the existence of such a claim as a basis for granting the writ. He also argues that the deference owed to State court decisions on the merits of habeas claims under AEDPA, 28 U.S.C. § 2254(d), does not apply to freestanding claims of actual innocence, and that the newly surfaced evidence meets the heightened standard of proof required to demonstrate his factual innocence.

We disagree. Although we assume *arguendo* that freestanding claims of actual innocence are cognizable, and additionally assume that Jimenez can overcome certain other contested threshold barriers, we hold that freestanding

5

actual innocence claims, even if cognizable, are evaluated under AEDPA's deferential standard, and that the standard of proof associated with such claims exceeds the proof of innocence required to excuse a belated petition. Accordingly, our analysis is constrained by AEDPA and the high standard applicable to freestanding innocence claims.

Under these legal constraints and on the facts of this case, the district court properly found that it could not grant Jimenez habeas relief. The evidence incriminating Jimenez is not compelling. Yet the newly surfaced exculpatory evidence, while troubling, is also subject to question. Even accounting for the expanded record developed in the district court, Jimenez – despite casting serious doubt on his guilt – has not carried the burden of proving his actual innocence under the standards set by AEDPA and the Supreme Court. Finally, like the district court, we find no merit in Jimenez's sole remaining claim for relief based on an alleged *Brady* violation at his trial.

We do not arrive lightly at these conclusions. We doubt that a reasonable jury would convict Jimenez in a new trial if presented with all of the evidence tending to prove his innocence. But doubt alone – even considerable doubt – is not enough to authorize us to grant a writ of habeas corpus on a claim of actual innocence. Therefore, on *de novo* review, we find no error in the district court's

analysis, and AFFIRM the judgment denying Jimenez's petition for a writ of

habeas corpus.

## BACKGROUND

When assessing a claim of innocence for the purpose of considering

whether to overcome a procedural bar to a habeas petition, courts are obliged to

"consider all [record] evidence, old and new, incriminating and exculpatory,

without regard to whether it would necessarily be admitted under rules of

admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006)

(internal quotation marks omitted), quoting *Schlup v. Delo*, 513 U.S. 298, 327-28

(1995). In addressing the merits of a habeas claim, the Supreme Court has held

that review under AEDPA, 28 U.S.C. § 2254(d)(1), "is limited to the record that

was before the state court that adjudicated the claim on the merits." *Cullen v.*

*Pinholster*, 563 U.S. 170, 181 (2011).[1] As a result, our summary of the factual record

on appeal is necessarily lengthy and requires a meticulous assessment of the

---

[1] Jimenez argues that this restriction on the scope of evidence available for our review does not apply to an actual innocence claim. We address that contention below.

differing evidentiary materials derived from Jimenez's original trial, the State

court post-trial record, and the record of the "gateway" federal court hearing.[2]

## I. The Murder of Michael Brana

Michael Brana was shot outside his apartment building on June 25, 1992, in

front of his wife, Carmen Velazquez,[3] and his friend and neighbor, Harry Ramos.

Brana was home at the time only because Velazquez had told him by telephone

that a group of men had harassed her earlier that day, including one man who

spat at her, when she left a neighborhood bodega with her minor stepdaughter.

Brana left work early, arrived home around 3:00 p.m., and then stood outside the

building with Ramos, who urged him not to fight the harassers because they

were dangerous. Velazquez joined them some time between 4:00 or 4:30 p.m.

Five men approached the trio at around 5:00 p.m. Accounts differ as to

what occurred next. At trial, Velazquez testified that a short man stepped

forward and taunted Brana in Spanish, and that she knew from his accent that he

---

[2] Unless otherwise noted, the descriptions of underlying events in this section of the opinion are drawn from witness testimony and documentary evidence entered at Jimenez's trial.

[3] Velazquez's surname is inconsistently spelled in the record, varying between that spelling and "Velasquez." We use "Velazquez" for the sake of consistency, noting that Jimenez's brief on appeal uses both spellings.

was from the Dominican Republic. She said the short man asked "if the guy behind him was the guy that [Brana] was looking for," and after Brana responded that he was "not looking for anybody," the short man stepped aside and the man standing behind him fired three shots, killing Brana. App'x 251-52. Velazquez was about eleven feet away and saw the shooter's face for about thirty seconds. She then fled indoors and called the police. She never heard the shooter speak.

Ramos testified at trial to a slightly different sequence of events: that almost as soon as the group of men approached, one of them punched Brana, and when Brana moved to fight back, the assailant stepped aside and another man standing behind him fired four shots.[4] Ramos recognized the shooter as a man he knew by the nickname "Monaguillo," whom he had seen around the neighborhood. He testified that, just before opening fire, Monaguillo said to Brana in Spanish, "[H]ey cocksucker what is it that you want?"[5] *Id.* at 340. The

---

[4] As noted above, Velazquez testified that she had heard three shots. At trial, the medical examiner who had performed the autopsy confirmed that there had been four gunshot wounds in Brana's body, including a bullet wound to the head.

[5] In his recantation testimony at the gateway innocence hearing, Ramos departed from his trial testimony by claiming that he did not see all four shots because he hid under a tree during the shooting.

men then fled.

Importantly, Ramos testified at trial in Spanish through an interpreter, so the jury heard only the English translation of what the shooter said to Brana. When Ramos recanted almost two decades later, he attested that the shooter used a particular Spanish word translated as "cocksucker" in English: the exclusively Dominican slur "mamaguevo," which Ramos insists would not be used by Spanish-speakers of any other national origin. The significance of the shooter's word choice, especially as a means of identifying him or determining his ethnicity, was never an issue at trial.

## II. The Arrest of Rafael Jimenez

### A. *Eyewitness Descriptions*

About a half hour after the shooting, New York police detective Floyd Coor interviewed Velazquez in her apartment, in the presence of another detective, Kenneth Thompson. The narrative portion of the police report, signed by Detective Coor, recorded that she described the man who had harassed her earlier that day as a five-foot, six- or seven-inch tall Dominican man, roughly 23

10

or 24 years old, with long black hair in a Jheri curls hairstyle,[6] sporting a mustache, wearing a white tank top and denim shorts, and driving a red sports car. In the preset fields for entering a suspect's description at the top of the form, however, the report describes the shooter slightly differently: a Hispanic male, aged 25 or 26, about five feet, nine inches in height, with a light mustache and goatee, and wearing a white tank top and khaki shorts.[7]

The report does not clearly indicate whether the shooter and the harasser were different men, or whether these were inconsistent descriptions of the same person. As explained below, at trial, Velazquez insisted that she never saw the man who harassed her and that the only physical description she gave to Detective Coor was of the shooter. Detectives Coor and Thompson, however, testified that she described two different people – the harasser and the shooter.

---

[6] Jheri curls, also sometimes spelled in the record as "Geri curls," and spelled as "Jerry curls" in the police report, is a distinctive hairstyle that was popular between the late 1970s and early 1990s. Because the style is named after its creator, Jheri Redding, we use the spelling "Jheri curls" in this opinion. *See* Karen Grigsby Bates, *Comer Cottrell, Creator of the People's Jheri Curl, Dies at 82*, NPR (Oct. 11, 2014), https://perma.cc/532A-UXXX; *see also Burns v. Mays*, 598 U.S. ----, 143 S. Ct. 1077, 1078 (2023) (Sotomayor, *J.*, dissenting) (adopting the spelling "Jheri curls").

[7] The top half of the police report form was not offered into evidence at trial, but was used only to refresh the witnesses' recollections on the stand.

## B.    *Photographic Arrays*

After the on-site interview, Velazquez went to a police precinct with Detective Thompson, who showed her a photographic array consisting of pictures of male Dominicans. The array did not include a photograph of Jimenez, and Velazquez did not identify anyone. Detective Thompson interviewed Ramos at a different precinct the next day, June 26, and recorded in a police report that Ramos told him that the shooter was a male Dominican "known to [Ramos] as 'MONAGUILLO,'" whose pre-shooting exchange of words with Brana suggested to Ramos that the shooter had also been the man who had harassed Velazquez. *Id.* at 41. Detective Thompson testified at trial that he did not ask Ramos for a description of Monaguillo because Ramos already "knew the subject." *Id.* at 377.

Accounts of what happened next again differ. Detective Thompson's contemporaneous police report recorded that, after the interview, Ramos went through a photographic array containing several hundred pictures and "picked out a photo of a subject known to this dept. as RALF JIMENEZ."[8] *Id.* at 42. At the

---

[8] At a pretrial hearing, Detective Thompson testified that the array that Velazquez looked at on June 25 was an entirely different set of photographs than the array reviewed by Ramos on June 26. The photograph of Jimenez was a black-and-white mugshot taken in March 1991. In that picture, he sports a mustache, goatee, and close-cropped hair – no Jheri curls. Additionally, Jimenez's

12

gateway innocence hearing held over twenty years later, however, Ramos

testified that Detective Thompson showed him only two or three photographs,

and that he had refused to select one because Monaguillo was not among them,

even though police officers urged him to select a particular photograph and told

him that Brana's wife had already selected it. Detective Thompson, testifying at

the same hearing, stated that he had no recollection of that day, but insisted that

he would never show a witness a limited selection of photographs or suggest that

the suspect was among them.

In any event, it is undisputed that on that same day, Detective Thompson

obtained an updated photograph of Jimenez,[9] included it in a photographic array

with five other subjects, and showed the array to Velazquez, who positively

identified Jimenez. At a pretrial hearing, Detective Thompson testified that

Velazquez identified Jimenez "almost immediately." *Id.* at 128.

---

real name is not Rafael or Ralf Jimenez, but Alfredo Jimenez. Police records
identified him by the name "Ralf" or "Rafael" because Jimenez, practicing the
wisdom of teenagers, had previously given that name to police in an
unsuccessful effort to throw them off from his drug dealing activities.

[9] Jimenez's features in the updated photograph, a mugshot taken in color and
dated March 25, 1992, were not much different from the March 1991 black-and-
white photograph; he had the same facial hair and close-cropped hair. There
were no Jheri curls.

C. *Lineup*

Detective Thompson could not immediately locate Jimenez at his known locations, so in September 1992, he prepared and circulated Jimenez's March 1992 photograph on a "Wanted" poster. The poster described Jimenez as a Hispanic male, aged seventeen, five-feet, eight-inches tall, with a medium complexion and short, black, curly hair.

Jimenez, however, was never very far from where Detective Thompson had been searching. He had been serving a probationary sentence for a prior drug offense and semi-regularly reported to his probation officer between March and November 1992 at a Bronx location close to both his own residence and the scene of the shooting. His probation officer testified at trial that Jimenez came to appointments on June 23 and June 30 – just before and after the murder – and ultimately came to about ten meetings during the summer of 1992 (and missed about seven meetings).

It was not until October 14, 1992, that Detective Thompson arrested Jimenez several blocks from the crime scene. The next day, Jimenez was placed in the third position of a six-man lineup at a police precinct. Ramos arrived with his father and viewed the lineup at 7:12 p.m., but – according to Detective

14

Thompson's police report – he was "unable to identify" Jimenez. *Id.* at 52. Detective Thompson testified at trial that Ramos "refused to make an identification." *Id.* at 381. At a pretrial hearing, Detective Thompson went further and expressed his belief that Ramos had refused to identify Jimenez only because his father, speaking in Spanish, appeared to discourage Ramos from getting involved. At the 2017 gateway innocence hearing, Ramos affirmed that he did not pick anyone out of the lineup and that his father told him not to get involved, but alleged that Detective Thompson pushed him to identify Jimenez by saying "it's number so and so." *Id.* at 1037-38. Detective Thompson denied that allegation.

Velazquez next viewed the lineup at 7:16 p.m. and positively identified Jimenez. The reliability of that identification, however, was arguably diminished by an encounter Velazquez had on her way to the lineup. Brana's sister, who had copies of the Wanted poster with Jimenez's face on them in the backseat of her car, had driven Velazquez partway to the precinct. Velazquez saw the posters and discussed them with her sister-in-law. At trial, Velazquez admitted that she saw the Wanted poster just before viewing the lineup, but claimed that she picked Jimenez out of the lineup shortly thereafter based only on her observation of the shooter, not from the poster.

15

### III.    The Trial

Jimenez was principally charged with second degree murder in violation of New York Penal Law § 125.25(2). In January 1993, his then attorney filed a pretrial Notice of Alibi signaling his intent to call an alibi witness named Raymond Rosario. That intention was never acted on, however. The possibility of raising an alibi defense would not come up again until the pretrial hearing in September 1994, when Jimenez's new defense counsel explained that he "had three alibi witnesses a long time ago," but for "reasons uncertain to [him] at this time," he could not bring the witnesses to court.[10] *Id.* at 170.

The trial lasted only four days.[11] The State's case-in-chief relied entirely on eyewitness identification. Although the prosecutor's opening statement to the jury forecast only Velazquez as the State's principal witness, eventually, as described more fully below, both Velazquez and Ramos identified Jimenez from

---

[10] Jimenez's first attorney filed the Notice of Alibi on January 26, 1993. At some later point he obtained new counsel, Rudy Velez, who represented him at trial.

[11] The State called six witnesses (Brana's sister, the first police officer on the scene, Velazquez, Ramos, the medical examiner, and Detective Thompson), and the defense called two (Detective Coor and Jimenez's probation officer). Jimenez did not testify.

the witness stand.[12] The defense's opening also previewed that, because "this case is about mistaken identification," it would primarily attack the reliability of Velazquez's identification. *Id.* at 210-11. Neither opening statement mentioned Ramos.

### A. Velazquez

Velazquez and Ramos testified on the second day of trial. Velazquez took the stand first and, after delivering her account of the killing, identified Jimenez as the shooter in the courtroom. When asked how she described the killer to Detective Coor after the shooting, she testified that the killer was Dominican, about 25 years old, and had black hair about three to four inches in length in "like [Jh]eri curls." *Id.* at 257. When asked to compare that description to Jimenez's appearance that day in the courtroom, she testified that he looked different than he had on the day of the shooting because "[h]is hair is shorter," *id.* at 262, but said that she otherwise had no trouble recognizing him as the shooter.

On cross-examination, Velazquez denied that she gave two different descriptions – one of the harasser and one of the killer – to Detective Coor right

---

[12] Indeed, at the pretrial hearing, the prosecutor represented that the State's case relied on Velazquez as the "*one* identifying witness." *Id.* at 168 (emphasis added).

after the shooting. Rather, she testified that while she told Detective Coor about the harassment, she "didn't give him a description of the person who was harassing [her]," *id.* at 270, and insisted that she never even saw the harasser. She maintained instead that she only "described the killer," *id.* at 276, including that the killer had "long, black [Jh]eri curls," *id.* at 282, and that he "was Dominican," *id.* at 293.[13] She explained that she knew the killer was Dominican not from his accent (because she did not hear him speak) but that she could "tell this [was] a group of Dominicans" from the accent of the short man who first taunted Brana. *Id.* at 295. Finally, she testified that she had also described the killer to Detective Thompson, and that Detective Coor had not recorded on the police report every detail of the shooter's description that she had given to him because the top portion of the report recorded the suspect as Hispanic (rather than Dominican) and omitted the color of his skin and his "curly hair." *Id.* at 328.

---

[13] It is difficult to interpret from a cold record, but the trial transcript indicates that Velazquez's demeanor on cross-examination was hesitant and less than confident. The transcript records that in response to defense counsel's questioning about her post-shooting description, she frequently went silent or repeated that she told Detective Coor "a lot of things." *Id.* at 267-68, 271, 274, 281, 290. Still, even though Velazquez's testimony contradicted that of the detectives, her story remained internally consistent. She did not contradict *herself*; she consistently maintained that she never saw the harasser or told Detective Coor what he looked like, and that she had described only the killer.

Velazquez's testimony conflicted with the testimonies of both detectives. Detective Thompson, called by the prosecution, testified that Velazquez had described two people, not one, in the post-shooting interview. And Detective Coor, called by the defense, more expansively testified that when he first arrived at the scene (before Detective Thompson), Velazquez gave him a description of the harasser, *not* the shooter, and told him that the harasser was a different man who sported long black Jheri curls, wore denim shorts (not khakis), and drove a red sports car. Detective Coor further testified that when Detective Thompson arrived later, it was he who took down Velazquez's separate description of the *shooter* – "a male Hispanic 25, 26," wearing khakis, with no mention of curly hair, which is the description appearing in the preset fields "on the top" of the police report.[14] *Id.* at 420. Detective Coor insisted that, based on what Velazquez told him, the shooter was *not* the same person as the harasser, though she had said that both were "male Dominican[s]." *Id.*

Velazquez's description of the shooter, moreover, did not match the description of Jimenez's appearance around the time of shooting as captured in

---

[14] Detective Coor testified that Detective Thompson took down that description and then distributed it to other police officers on the off chance that the shooter could be apprehended near the scene.

19

Jimenez's mugshots, and as recounted by Jimenez's probation officer at trial.

Neither the March 1991 nor March 1992 mugshots of Jimenez that had been in the photographic arrays, nor the October 1992 mugshot taken at his booking, showed him wearing anything but short, mostly straight, hair – not Jheri curls, or even hair long enough to be styled into Jheri curls. Jimenez's probation officer, who had seen him regularly in face-to-face meetings during 1992, also testified that in June 1992, Jimenez had short hair similar to how he looked in the courtroom, and that he had never seen Jimenez with long Jheri curls (although he admitted that his recollection of Jimenez's appearance two years prior to the trial was vague).

B.     Ramos

Ramos took the stand immediately after Velazquez and delivered brief, wavering testimony through a translator.[15] He testified to his recollection of the shooting, including hearing the man he knew as Monaguillo call Brana the slur translated in English as "cocksucker." But he also testified that he had picked

---

[15] Before Ramos took the stand and outside the presence of the jury, the prosecutor stated that Ramos had agreed to testify voluntarily and without a cooperation agreement even though he was, by the time of the trial, serving a prison sentence for an unrelated drug offense. Although there was no cooperation agreement, the prosecutor stated that he had informally promised that he would keep Ramos's family safe by helping them move from the area.

suspect number four in the lineup (not Jimenez), then appeared to change his mind, saying that he picked no one at all and, in fact, could not remember what the shooter looked like. He initially resisted the prosecutor's invitation to identify Monaguillo in the courtroom, responding that it had been a "long time" since he recognized him. *Id.* at 341. Later, after the prosecutor had reminded Ramos of his prior identification at the precinct, the prosecutor asked Ramos whether he saw "anyone in the courtroom that look[ed] like" the man who shot Brana, and Ramos pointed to Jimenez. *Id.* at 345.

On cross and redirect examination, Ramos described the basis for his identification: he was positive the shooter was Dominican,[16] he recognized the killer from having seen Monaguillo before, and he knew the shooter's ethnicity because he had known Monaguillo "for about a year or two." *Id.* at 352. Asked once more by the prosecutor if Monaguillo was in the courtroom – after the prosecutor assured him that "nobody is going to hurt you" and "[y]ou swore to tell the truth" – Ramos indicated Jimenez. *Id.* When defense counsel asked on recross if Ramos would describe the shooter as having Jheri curls, Ramos did not

_____

[16]As further discussed below, Jimenez is Puerto Rican, not Dominican. Although both identifying witnesses testified that the shooter was Dominican, defense counsel did not introduce any evidence that Jimenez was not.

answer directly, instead responding that the shooter's hair was "[n]ot too long." *Id.* at 354.

C. *Closing and Verdict*

The defense's closing argument followed its previewed strategy of arguing that Velazquez's identification was unreliable, primarily pointing to the short time she had to observe the shooter (thirty seconds), her distress and divided attention, her arguably tainted lineup identification, and the contradiction between her testimony and her "[t]otally inconsistent" prior statements to Detective Coor. *Id.* at 475. Defense counsel mentioned Ramos only briefly, arguing that Velazquez's account was not corroborated by Ramos's wavering, noncredible identification.

The prosecutor, however, appeared to recognize that Velazquez's testimony was weaker than expected, because even while he argued that any inconsistencies in the details of Velazquez's testimony were attributable to her trauma and to a possible mistake by Detective Coor, he acknowledged she was "not the best witness in the world." *Id.* at 598. He instead assured the jury that it could rely on Ramos as a disinterested observer of the shooting, remarking that, even though he had not expected Ramos to identify Jimenez because Ramos was

22

clearly afraid of Jimenez, Ramos had "summ[on]ed up the courage . . . [and] finally did the right thing." *Id.* at 598-99.

The jury deliberated for two days. It first asked for a readback of Ramos's description of the shooter, Velazquez's testimony about the harasser, Detective Thompson's testimony, and all physical evidence, and then it briefly deadlocked. After requesting another readback of Ramos's testimony, the jury returned a guilty verdict on October 4, 1994.

Jimenez was subsequently sentenced to an indeterminate term of 25 years to life in prison. His conviction and sentence were affirmed on direct appeal. *People v. Jimenez*, 647 N.Y.S.2d 947 (1st Dep't 1996) (rejecting Jimenez's unpreserved objection to the admission of Velazquez's lineup identification based on her "fortuitous viewing" of the Wanted poster), *leave to appeal denied*, 89 N.Y.2d 924 (1996). In 2001, he unsuccessfully moved *pro se* to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10.

He did not try again for twelve years.

### III.   Newly Surfaced Evidence

#### A.    Ramos's Recantation

Nineteen years after Jimenez's trial, Ramos recanted his testimony and

declared that he was "completely certain that the person incarcerated is innocent." App'x 68. That certainty was based on Jimenez's ethnicity. In a handwritten affidavit dated April 11, 2013,[17] Ramos averred that he knew that the killer, the man he recognized as Monaguillo, was Dominican because he heard him utter the exclusively Dominican slur "mamaguevo" just before shooting Brana. Following a chance encounter between Ramos's wife and Jimenez's sister in 2010, Ramos learned that Jimenez was actually Puerto Rican, not Dominican. That was when he realized that Jimenez was innocent, because "we Puerto Ricans use cabrón" for the same slur, rather than "mamaguevo." *Id.* at 67 (accent added).

That distinction in dialect was crucial, Ramos alleged, because he identified Jimenez in the courtroom at his trial only because Detective Thompson improperly influenced him. Ramos alleged that Detective Thompson, who had transported Ramos to the courthouse, misleadingly assured him that Jimenez was Dominican just before he took the stand. Specifically, Ramos averred:

---

[17] Ramos wrote his affidavit in Spanish. A typed English translation was entered into the record, but there is no indication of who made the translation. Additionally, the English translation of Ramos's affidavit recorded 2012 as the year it was written, but Ramos's handwritten, notarized statement in Spanish records the year as 2013.

> [T]he black detective [Thompson] brought me to court to testified and the placed me in a small room and showed me a picture allegedly of the person who killed [Brana] when they showed me the picture I asked if he was Dominican o Boricua [Puerto Rican] and he told me that he was Dominican I asked him because I wanted to make sure that he was not Puerto Rican because I knew that the person who killed him was Dominican. And when he showed me the picture I was still uncertain that its why I asked the detective if he was Dominican o Puerto Rican when he said to me that he was Dominican I thought that they had him and I thought that he was the one who killed [Brana]. When I asked him again if he was Dominican and he said he was I trusted the detective and the wife because the wife said he was that's what the detective said and I trusted him.

> When I was brought up to testify the detective told me not to look at anyone in the court when I was asked if he was there I then tried to look but I was still confused and had to point out the person that was there.

*Id.* at 67-68 (spelling and grammar retained).

At the gateway innocence hearing, Ramos further alleged that Detective Thompson not only showed him a photograph of Jimenez, but told him that Jimenez was the shooter, instructed him to point him out in the courtroom "without looking at him," and promised him "all manner of castles and treasure." *Id.* at 1044-45. Ramos maintained that he identified Jimenez at trial only "because of the pressure" applied by Detective Thompson. *Id.* at 1047.

25

Detective Thompson, at the same hearing, testified that he could not recall any such conversation with Ramos but denied that he would ever tell a witness that another witness already identified the defendant; he furthermore insisted that at the time, he did not understand any difference between Puerto Ricans and Dominicans, and classified all Spanish-speakers as Hispanics.

  B.  *Alibi Witnesses*

In 2013 and 2014, two former friends of Jimenez, Amancio Delgado and Danny Hernandez (the "Alibi Witnesses"), wrote affidavits swearing that on June 25, 1992, the day of the shooting, they had been with Jimenez all day on a street corner about a mile from Brana's apartment. That day was still memorable two decades later because, Hernandez averred, a group of his friends including Jimenez (nicknamed "Spaz") were hanging out on their usual corner of Townsend Avenue and Mt. Eden in the Bronx to celebrate Hernandez's eighteenth birthday. They were there from the early afternoon until about 10:00 or 11:00 p.m. After Jimenez's arrest, Hernandez approached Jimenez's attorney and offered to testify, but he was never called.[18] Hernandez never spoke with

_____

[18] The notes of Jimenez's trial counsel, Velez, corroborate that Hernandez came forward with the alibi about celebrating his eighteenth birthday with Jimenez on the day of the murder. Velez even had a copy of Hernandez's birth certificate. Yet

Jimenez again after his conviction.

Delgado similarly recounted that he regularly hung out with his friends on that street corner, and he had been with Jimenez (also nicknamed "Tito") celebrating Hernandez's birthday between noon and around 10:00 p.m. Delgado asserted that he also met with Jimenez's attorney after the arrest to discuss his willingness to be a witness, but he, too, was never called, and he ultimately lost contact with Jimenez over five years prior to writing his affidavit. Finally, Delgado, who is Dominican, averred that there was no mistaking Jimenez as anything but a "typical New York Puerto Rican" who "speaks Spanish with a heavy Puerto Rican accent," and that "mamaguevo" is a "word that only Dominicans would say, and it's not a word that [Jimenez] would be expected to say, and [Delgado had] never heard him say it." *Id.* at 60.

The Alibi Witnesses gave few additional details of relevance in their live testimony at the gateway innocence hearing. Hernandez testified that Jimenez

Velez did not explain why he never called Hernandez, and Jimenez's current counsel asserts that when he spoke with Velez, Velez could not remember the case or why he forwent an alibi defense. Since Jimenez does not claim that his conviction was tainted by ineffective assistance of his trial counsel, *see Strickland v. Washington*, 466 U.S. 668 (1984), we do not speculate about what, if any, strategic reason his defense attorney may have had for deciding not to pursue an alibi defense.

had been with him most of the day, and in fact arrived at the corner before he did, but admitted that they had each separately left a few times to buy beer and marijuana and use the bathroom. Delgado, on the other hand, testified that Jimenez never left his line of sight that day.

## IV. State Court Decision

In 2014, Jimenez once more sought to vacate his conviction in State court pursuant to New York Criminal Procedure Law § 440.10, submitting in support Ramos's affidavit, the affidavits of the Alibi Witnesses, and the affidavit and expert report of a sociolinguist.[19] *Jimenez I*, 2015 WL 770457, at *2. Jimenez

---

[19] In her expert report and testimony at the 2017 gateway innocence hearing, the sociolinguist attested to reviewing Ramos's affidavit and explained the ability of native Spanish-speakers to identify another speaker's nationality by their dialect. Her testimony primarily corroborated Ramos's contention that he could distinguish Spanish-speakers from the Dominican Republic from speakers from Puerto Rico by their use of a single word. However, her report had been rendered before she learned, from the State's voir dire at the gateway innocence hearing, that Jimenez had "friends who were Dominican." App'x 1085-86. She conceded that it was "possible" that a Spanish-speaker could borrow terms from other speakers with whom he associated. *Id.* at 1086.

The parties debate the reliability of her expert conclusions. Like the magistrate judge who presided over the gateway innocence hearing, we view the sociolinguist's contribution to the merits of this case as offering only minimal support to the fundamental issue of Jimenez's actual innocence claim, as her testimony bears only on the believability of Ramos's ability to distinguish between Spanish-speakers of different national origins by their manner of speech; it does not independently corroborate his (and Delgado's) specific discussion of

claimed that he was actually innocent, and that Detective Thompson's alleged conversation with Ramos prior to his trial testimony constituted witness tampering and violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), as exculpatory evidence withheld from the defense. *Jimenez I*, 2015 WL 770457, at *1-2.

The State court denied Jimenez's motion without holding an evidentiary hearing. *Id.* at *1, *12. New York State law recognizes freestanding claims of actual innocence, but the State court, citing federal law, chiefly held that Jimenez failed to make a *prima facie* case of innocence because Ramos's recantation story was "implausible," and in any event insufficient to establish Jimenez's innocence. *Id*. at *8. The State court found it notable that Ramos's affidavit was silent on the "foundation for defendant's initial identification," which was that Ramos had claimed that he knew Monaguillo before the shooting and that Jimenez was Monaguillo. *Id.* at *6. It also pointed to the fact that the jury heard both eyewitnesses testify that each of them believed the shooter to be Dominican, but

the Dominican origin of the reported slur. *Jimenez v. Lilley*, No. 16cv8545(AJN)(JCF), 2017 WL 4535946, at *13 (S.D.N.Y. Oct. 10, 2017). Because we assume that Ramos's story is believable, we do not further address the sociolinguist's opinion.

29

that Velazquez did not base her judgment of the killer's national origin on anything the shooter said because she claimed that she did not hear him speak at all. *Id.* at *4.

The State court further found that Ramos's initial resistance to identifying Jimenez in the courtroom did not indicate coercion, but merely demonstrated that he had been a "hesitant, reluctant witness who was fearful to make an in-court identification and only did so when reminded that nobody was going to hurt him and that he swore to tell the truth." *Id.* at *7. The State court accordingly rejected out of hand "the specious proposition that the two eyewitnesses, both of whom were Puerto Rican, would never erroneously identify a fellow Puerto Rican as Dominican." *Id.* It reasoned in the alternative that, even if Ramos were credible, his recantation still could not demonstrate that Jimenez's innocence was "highly probable" in light of Velazquez's unequivocal in-court identification. *Id.* at *8. Instead, Ramos's recantation had merely "cast[] doubt" on Jimenez's guilt, because, "at most," it was evidence in "direct conflict" with Velazquez's identification. *Id.*

The State court also found that the Alibi Witnesses' affidavits lacked credibility because they claimed to remember their activities on a specific date

30

over two decades ago. *Id.* at *9. But even overlooking credibility, the court reasoned that the alibi, taken as true, still placed Jimenez within a mile of the crime scene – close enough that the group could have "migrated the short distance to the scene of the homicide." *Id.* The State court also pointed to Delgado's affidavit in support of its inference that, contrary to any suggestion of a sharp social separation between Dominicans and Puerto Ricans in the Bronx in the early 1990s, Jimenez's teenage group of friends included at least one Dominican from whom he could have easily picked up a Dominican profanity. *Id.*

Finally, the State court found there had been no *Brady* violation stemming from Detective Thompson's alleged statement to Ramos about Jimenez's ethnicity because that conversation was not material exculpatory evidence. *Id.* at *12-13. The State court's judgment became final when Jimenez's request for permission to appeal the judgment was denied in November 2015.

## V. Gateway Innocence Hearing

Jimenez filed a petition for a writ of habeas corpus a few days after expiration of the one-year deadline to petition from a final judgment pursuant to

28 U.S.C. § 2244(d)(1). *Jimenez v. Lilley* ("*Jimenez R&R*"), No. 16cv8545(AJN)(JCF), 2017 WL 4535946, at \*1 (S.D.N.Y. Oct. 10, 2017). Accordingly, in June 2017, Magistrate Judge James C. Francis held a two-day evidentiary hearing to determine whether Jimenez's untimeliness was excusable under the equitable exception for gateway innocence as set forth in *Schlup v. Delo*, 513 U.S. 298, 319, 323-30 (1995). *Jimenez R&R*, 2017 WL 4535946, at \*7-9. Ramos, the Alibi Witnesses, Detective Thompson, Jimenez, and the sociolinguist testified. *Id.* at \*9.

As relevant here, Magistrate Judge Francis found that, even according the factual conclusions of the State court a presumption of correctness as required by AEDPA, 28 U.S.C. § 2254(e)(1), the detailed and cross-consistent testimonies of Ramos and the Alibi Witnesses rebutted the State court's credibility determinations by clear and convincing evidence. *Jimenez R&R*, 2017 WL 4535946, at \*10-13. He also found that Jimenez had established a compelling claim of actual innocence in part because Velazquez's description at trial contradicted the police report recorded by Detective Coor and, "[m]ost importantly," because her description did not match Jimenez's appearance, undermining the only remaining inculpatory evidence linking Jimenez to the crime. *Id.* at \*14-18. Moreover, even though Jimenez's alibi did "not eliminate the possibility that Mr.

Jimenez committed the crime" because Hernandez admitted that they had occasionally left the corner, Magistrate Judge Francis found the Alibi Witnesses' story reliable and – unlike the State court – thought it unlikely that Jimenez could have left his friends and walked a mile away to Brana's building without arousing their suspicion. *Id.* at *16. Accordingly, because of "Ms. Velazquez's description that does not match Mr. Jimenez, Mr. Ramos' dubious identification and eventual recantation, Mr. Jimenez's plausible alibi supported by two reliable witnesses, and the weakness of the prosecution's case," Magistrate Judge Francis recommended allowing Jimenez to "pass through the actual innocence gateway" and avoid the untimeliness barrier to consideration of the merits. *Id.* at *16-18.

The district court adopted that recommendation in full. *Jimenez II*, 2018 WL 2768644, at *1. It stressed, however, that its gateway innocence findings did not reflect its ultimate determination on the merits. *See id.* at *17. Shortly thereafter, in July 2018, Jimenez was released from State prison on parole.

## VI. The District Court Opinion

On September 15, 2021, the district court denied habeas relief on the merits of Jimenez's claims. *Jimenez III*, 560 F. Supp. 3d at 764. The court principally held

33

that, "considering the extraordinarily high showing that would be required for a freestanding claim of actual innocence and the deference due a state court's merits adjudication under AEDPA," it had to deny Jimenez's actual innocence claim because he merely "cast considerable doubt on his guilt," but did not affirmatively demonstrate "that he *did not* commit, or *could not* have committed" the crime. *Id.* at 771-72 (emphasis in original) (internal quotation marks omitted), first quoting *House*, 547 U.S. at 555 (2006); and then quoting *Hyman v. Brown*, 927 F.3d 639, 665 (2d Cir. 2019). That was so because there remained sufficient doubt of Jimenez's innocence, as the Alibi Witnesses did not rule out the possibility that Jimenez had traveled unnoticed to the scene of the shooting, and Velazquez's identification was not wholly unreliable. *Id.* at 772. The district court also found no merit to Jimenez's *Brady*/witness tampering claim based on Detective Thompson's allegedly misleading remarks to Ramos about Jimenez being Dominican. *Id.* at 773-74. This appeal followed.[20]

## DISCUSSION

---

[20] The district court issued a certificate of appealability on Jimenez's freestanding actual innocence claim but declined to enter one as to his *Brady*/witness tampering claim. *Jimenez III*, 560 F. Supp. 3d at 774. This Court expanded the scope of this appeal to include that claim. Mot. Order, *Jimenez v. Stanford*, No. 21-2582-pr (2d Cir. Mar. 8, 2022), ECF No. 51.

Jimenez maintains that he was wrongly convicted of a crime he did not commit. Under AEDPA, however, federal courts may entertain his petition for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). Jimenez raises many arguments on appeal aimed at reviving his claim of actual innocence and his *Brady*/witness tampering claim. For its part, the State rebuts those arguments, and argues in the alternative that, at the threshold, Jimenez's petition should be dismissed as time-barred.

We decide only those issues necessary to our conclusion that the district court's decision to deny habeas relief from Jimenez's State conviction on the merits, which we review *de novo*, must be affirmed. *Scrimo v. Lee*, 935 F.3d 103, 111 (2d Cir. 2019). We also review the "district court's ultimate finding [relating to] actual innocence *de novo*." *Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (internal quotation marks omitted), quoting *Doe v. Menefee*, 391 F.3d 147, 163 (2d Cir. 2004).

As a preliminary matter, however, we note that while we review the district court's decision without deference, our authority to grant Jimenez relief is tightly circumscribed because § 2254(d) of AEDPA requires deference to the

35

judgment of the *State* court. AEDPA provides that a petition for habeas relief from a State conviction "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings" unless the State court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). As we explain, little federal law on actual innocence has been established, much less *clearly* established, so as to make this showing a straightforward task. Yet we remain troubled in spite of AEDPA because the newly surfaced evidence of Jimenez's innocence, compared to Velazquez's now-uncorroborated identification, leaves us concerned that he may, in fact, be innocent of the murder of which he stands convicted.

Nonetheless, our review of the record confirms that Jimenez has not affirmatively demonstrated his innocence under any plausible set of assumptions or standard of review. Even after Ramos's recantation and Jimenez's newly introduced alibi, Velazquez's identification remains as sufficiently incriminating as it did almost thirty years ago. As a result, AEDPA deference or not, Jimenez

36

has not proven his innocence. Nor has he shown that a *Brady* violation occurred at his trial. We must, therefore, deny habeas relief.

## I.      Freestanding Actual Innocence

The legal landscape of freestanding actual innocence is hostile territory for a petitioner seeking relief from a state conviction. At least four barriers stand between Jimenez and his claim for relief. The first is the open question of whether a freestanding innocence claim is even cognizable at all under federal law, especially in a noncapital case. The second barrier is the statute of limitations; the State argues that our analysis ought to stop there because, it contends, the district court erroneously reached the merits of Jimenez's claims by finding that he had sufficiently demonstrated his actual innocence to avoid that obstacle. The third barrier is the "extraordinarily high" standard of proof that the petitioner must meet to affirmatively establish innocence, assuming such a claim is cognizable. *Herrera v. Collins*, 506 U.S. 390, 416-17 (1993). Finally, after all these hurdles are surmounted, the fourth barrier is the deference owed under § 2254(d) of AEDPA to the merits determinations of a state court when those determinations are not unreasonable.

Jimenez must surmount each of these barriers to obtain relief on his

freestanding actual innocence claim. He cannot. Even assuming that a freestanding innocence claim is cognizable, that Jimenez's petition is not time-barred, and that a habeas court may consider evidence entered at a federal evidentiary hearing, we hold that a freestanding innocence claim requires a higher standard of proof than the certainty required to establish gateway innocence. We additionally hold that AEDPA deference constrains our power to grant relief on the merits of such claims. Under those standards, Jimenez has shown, at most, only a probability that a jury would not convict him again at a new trial. That is not enough, under federal law and on the facts presented in this record, to establish that Jimenez is entitled to habeas relief.

### A. Cognizability

As a first step in assessing the ultimate merits of Jimenez's petition, we address his threshold argument that a freestanding claim of actual innocence is cognizable under the Eighth and Fourteenth Amendments. To this day, "[w]hether . . . a federal right [based on a claim of actual innocence] exists is an open question." *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009). The Supreme Court has provided scant guidance on the cognizability of a freestanding right to habeas corpus relief based on a claim of wrongful

conviction after a fair trial free of error. Neither it, nor we, nor any of our sister circuits have recognized the existence of such a right or granted habeas relief based on such a claim.[21] In *Herrera v. Collins*, the Court merely assumed without deciding that "*in a capital case* a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional," but concluded that the petitioner in that case had fallen "far short" of making that demonstration. 506 U.S. at 417-19 (emphasis added).

More importantly, *Herrera* announced that the burden of proof for a "threshold showing" of such a right "would necessarily be extraordinarily high." *Id.* at 417. Because we "assum[e], *arguendo*, that [an innocence right] exists" for the purposes of this case, and further assume that its scope extends beyond a

[21] Jimenez argues that the Supreme Court implicitly recognized a freestanding claim of innocence in *In re Davis*, in which the Court transferred a habeas petition in a capital case that had been directly filed in the Supreme Court under its original jurisdiction to the United States District Court for the Southern District of Georgia for factfinding on "whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence." 557 U.S. 952, 952 (2009). That case, however, never returned to the Supreme Court, *see Davis v. Humphrey*, 563 U.S. 901 (2011), and in any event, the district court denied relief on the merits after applying AEDPA, *see In re Davis*, No. CV409-130, 2010 WL 3385081, at *45-46, *61 (S.D. Ga. Aug. 24, 2010). Because we assume *arguendo* the cognizability of a freestanding innocence claim, we address *In re Davis* only insofar as it is relevant to Jimenez's arguments on the appropriate standard of proof and the application of AEDPA to freestanding innocence claims.

right against execution, we follow the path endorsed by the Supreme Court and other courts by bypassing "the difficult questions [recognizing] such a right would pose," and turn instead to "the high standard any claimant would have to meet." *Osborne*, 557 U.S. at 71.

Before proceeding, however, it is worth at least noting why those questions are so difficult. To the lay observer, it may seem intuitively obvious that the continued incarceration of an innocent person must violate the Constitution. Indeed, we have no quarrel with that abstract proposition. The most fundamental problem in making that right the basis of habeas relief inheres in establishing who decides, and by what standard of proof, that a convicted person is innocent. How strong must the evidence of innocence be before a federal judge (or a panel of federal judges) assumes the power to overrule the verdict of a state court and jury, after a fair trial, that a defendant is guilty beyond a reasonable doubt, based on evidence that is legally sufficient, if believed, to support the verdict? As discussed more fully below, the facts of this case exemplify the difficulty of answering those questions.

   *B.  Gateway Innocence*

We begin by assuming, without deciding, that Jimenez's untimeliness has been excused and thereby bypass the State's alternative argument that his petition is time-barred.[22] That said, the distinction between the more established standards of gateway innocence and the unsettled, hypothetical standards of freestanding innocence hinted at in *Herrera* is central to our analysis of the merits. Our discussion therefore starts with a necessary review of the strength of Jimenez's actual innocence claim under the threshold standards of gateway innocence.

Gateway innocence is an equitable exception allowing avoidance of AEDPA's one-year limitations period, 28 U.S.C. § 2244(d)(1), on the ground that a procedural limitation precluding a federal court from hearing the merits of a potentially innocent prisoner's habeas petition could result in a "fundamental

---

[22] Federal courts may bypass procedural default on habeas review when the merits are "easily resolvable against the habeas petitioner." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). We see no reason why the same proposition does not apply to AEDPA's statute of limitations where, as here, we more easily resolve the merits of an actual innocence claim against the petitioner. *Id.; see also* 28 U.S.C. § 2254(d) (providing that a federal court may not *grant* a writ of habeas corpus where a State court's merits determinations are reasonable, but not requiring a determination of all procedural grounds before *denying* a habeas petition on the merits).

41

miscarriage of justice."[23] *McQuiggin v. Perkins*, 569 U.S. 383, 393-98 (2013); *Schlup*, 513 U.S. at 319-21; *see also Cosey v. Lilley*, 62 F.4th 74, 80-81 (2d Cir. 2023). Untimeliness can be excused in a "narrow class of 'truly extraordinary' cases" of claims of actual innocence, *Hyman*, 927 F.3d at 656, quoting *Schlup*, 513 U.S. at 338 (Rehnquist, *J.*, dissenting), where such claims are supported by new evidence of "factual innocence, not mere legal insufficiency," *Bousley v. United States*, 523 U.S. 614, 623 (1998). Even if a petitioner overcomes this "demanding and rarely met" standard, however, gateway innocence "cannot itself afford [the petitioner] habeas relief from his state conviction. It can only open a gateway to federal

---

[23] AEDPA requires filing a habeas corpus petition in federal court one year from the date on which a State court judgment denying post-conviction relief becomes final, 28 U.S.C. § 2244(d)(1)(A), or, if a petitioner raises newly discovered evidence, one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," *id.* § 2244(d)(1)(D). *See Jimenez R&R*, 2017 WL 4535946, at *6 (calculating that Jimenez's petition was filed six days too late even assuming the latest possible date of diligent discovery). On appeal, Jimenez does not dispute that his habeas petition was untimely, instead relying on a showing of gateway innocence to excuse the untimeliness. The State argues that his petition was time-barred because the district court erroneously concluded that he met the gateway innocence exception. The State specifically contends that Ramos's recantation, the statements of the Alibi Witnesses, and the sociolinguist's expert opinion did not constitute newly discovered evidence. Because we assume *arguendo* that Jimenez has passed through the gateway, we do not address the State's arguments except to the extent that they bear on our assessment of the merits of Jimenez's actual innocence claim.

review" of an otherwise barred claim "that, if itself successful, could afford him relief." *Hyman*, 927 F.3d at 655, 662.

To reach the merits of such a claim, a habeas petitioner must make a "sufficiently credible and compelling" claim of innocence. *Id.* at 657; *see also Rivas*, 687 F.3d at 541 ("For the [innocence] claim to be 'credible,' it must be supported by 'new reliable evidence . . . that was not presented at trial.'"), quoting *Schlup*, 513 U.S. at 324. The second prong is our starting point for the standard of freestanding innocence.[24] A compelling innocence claim must demonstrate that, "more likely than not, in light of the new evidence, no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt." *House*, 547 U.S. at 538. To make that determination, a habeas court must consider all record evidence, "old and new."[25] *Id*. If, after that exhaustive review, the petitioner's evidence of

---

[24] In a full analysis, we would be obliged to review the district court's credibility assessment of live witness testimony "only for clear error." *Hyman*, 927 F.3d at 660. Because we assume that Ramos and the Alibi Witnesses are in fact credible, we do not address the State's contentions that they are unworthy of belief.

[25] The unrestricted scope of evidence available at the gateway innocence stage stands in contrast to the more limited scope of evidence available on federal review of the merits of any habeas claim, whether that claim is based on innocence or, more commonly, some other constitutional error. In general, under AEDPA, "evidence introduced in federal court has no bearing" on habeas review of claims that a state court has already decided on the merits. *Cullen*, 563 U.S. at

innocence is so compelling that the habeas court "cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error," the court may adjudicate the merits of otherwise procedurally barred claims. *Schlup*, 513 U.S. at 316.

That is no nominal demand. Courts have seldom found compelling claims of gateway innocence since the Supreme Court in *Schlup* recognized the exception, and *Schlup* itself only *suggested* that a new alibi witness and eyewitness testimony incriminating a third-party suspect could be compelling evidence of innocence. *Id.* at 331. The Supreme Court in the end declined to decide whether that standard had been met on the facts of that case. *See id.* at 331-32.

The only other examples of sufficiently compelling gateway innocence claims were close cases. In *House v. Bell*, the Supreme Court found compelling evidence of the petitioner's innocence in new forensic DNA evidence, which

---

185. Jimenez contends that we are not bound by AEDPA deference on the merits of actual innocence claims at all, and further argues that such deference at least does not apply in his case because the State court failed to hold an evidentiary hearing. In yet another of the several assumptions we make in his favor, we assume without deciding that Jimenez is correct about the scope of evidence available on our *de novo* review of the district court's decision because even the most expansive possible record does not change our conclusion that he has not affirmatively proven his actual innocence.

"called into question" the "central forensic proof connecting [him] to the crime,"

in combination with "substantial evidence" incriminating a third-party suspect

who had essentially confessed. 547 U.S. at 540-41, 553-54. Yet, *House* cautioned

that other inculpatory evidence "still support[ed] an inference of [the petitioner's]

guilt." *Id.* at 553-54. *House* therefore concluded that, even though the petitioner

had "cast considerable doubt on his guilt . . . sufficient to satisfy *Schlup*'s gateway

standard," it followed that his "close[]" satisfaction of that standard logically

"[fell] short of the threshold implied in *Herrera*." *Id.* at 555.

Similarly, in *Rivas v. Fischer*, we found compelling evidence of the

petitioner's innocence in a new expert opinion that revised the victim's time of

death to a period when he had an unchallenged alibi, as well as in unchallenged

testimony discrediting the originally incriminating medical examiner's report.

687 F.3d at 546. But *Rivas* again stressed that it was a "close case" and cautioned

that "we would not expect a lesser showing of actual innocence to satisfy the

*Schlup* standard." *Id.*

More recently, in *Hyman v. Brown*, we observed that *Schlup*, *House*, and

*Rivas* shared a common feature: new evidence "directly supported petitioner's

factual innocence by indicating either that he *did not* commit, or *could not* have

committed, the crimes of conviction." 927 F.3d at 665 (emphases in original).

*Hyman* reasoned that in each case, compelling evidence of innocence came through a combination of eyewitness misidentification, testimony and forensic evidence ruling out the petitioner's ability to commit the crime, and evidence strongly incriminating a third party. *Id.* at 665-66. We concluded that the petitioner had not met his burden in that case because even though the only eyewitness to identify him as a participant in a large shootout (out of a total of four eyewitnesses) had recanted her testimony, that alone did not affirmatively demonstrate that the petitioner did not, or could not have, fired a gun when the witness's recantation was compared to the weight of the remaining incriminating evidence (the other three eyewitnesses' testimonies, ballistics evidence, and the petitioner's concession that he had been at the scene). *Id.* at 666-71.

The State argues that *Hyman* forecloses the district court's finding that Jimenez made out a compelling claim of innocence because Velazquez's credible identification remains strongly incriminating. Velazquez's identification, however, is not nearly as strong as the remaining inculpatory evidence in *Hyman*. Unlike *Hyman*, here there is no physical evidence, no other eyewitnesses (given the recantation of Ramos), and no factual concessions by Jimenez linking him to

46

the time or place of the crime. There is only the uncorroborated accusation of a single eyewitness, whose reliability had been vigorously contested through cross-examination at trial. Velazquez's description of the shooter's appearance – specifically the shooter's distinctive Jheri curls – is at odds with Jimenez's appearance in 1992 and further undermines confidence in her reliability; indeed, the prosecution itself acknowledged at trial that Velazquez was "not the best witness in the world." App'x 598. The weaker incriminating evidence in this record distinguishes *Hyman.* The closeness of this case is sufficient to make us prefer to simply assume *arguendo* that Jimenez demonstrated a sufficient likelihood of innocence to satisfy *Schlup*'s "gateway" standard.

Yet that is not the end of our analysis. Although we assume that Jimenez has met his threshold burden, he has, at most, made out only a "close case" of gateway innocence. *Rivas*, 687 F.3d at 546. As in *House* and *Rivas*, the remaining inculpatory evidence is weak, and "it may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict" in order to pass through the innocence gateway. *Rivas*, 687 F.3d at 543. But unlike in *House* and *Rivas*, Jimenez's exculpatory evidence is *also* weak, because neither Ramos's recantation nor the Alibi

Witnesses' testimony undermines, much less "*thoroughly* undermines," *Rivas*, 687 F.3d at 543 (emphasis added), the independent basis for Velazquez's identification of Jimenez as the killer.

Jimenez's exculpatory evidence is, in fact, the same type of evidence as Velazquez's testimony – witnesses swearing to what they saw, heard, did, and thought. The resulting credibility contest, which may be compelling enough for the purposes of gateway innocence given the dearth of physical evidence cutting in either direction, does not surpass the heightened standard required on review of the merits of a freestanding innocence claim.

C.     *Standard of Proof*

Having assumed that Jimenez has passed through the actual innocence gateway, what standard applies when, after opening the door, all that lies beyond is the same claim of innocence? The Supreme Court struggled with that question prior to AEDPA's passage in 1996. In *Herrera* and its progeny, it decided only that whatever the standard of proof, it is "extraordinarily high." *See Herrera*, 506 U.S. at 417. Indeed, no court has *ever* found it met.

Jimenez's most potent argument on appeal is his effort to favorably calibrate *Herrera*'s "extraordinarily high" standard of proof in freestanding

48

innocence claims. *Id.* That effort, however, is ultimately unavailing. The trio of Supreme Court cases that form the backbone of what little federal law shapes the appropriate standard of proof demonstrates that, despite Jimenez's effort to articulate the exact quantum of proof required to show that he is truly innocent, he has not met his burden in this case.

Pre-AEDPA, *Herrera* vaguely described a cognizable actual innocence claim as requiring a "truly persuasive demonstration" in light of "the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States." *Id. Schlup*, which followed *Herrera*, then described the difference between the proof required to establish gateway innocence, as opposed to substantive innocence, by illustration:

> In *Herrera* . . . , the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" *even if* his conviction was the product of a fair trial. For Schlup, the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.

*Schlup*, 513 U.S. at 316 (emphases in original). Accordingly, *Schlup* concluded, if

"there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts *unquestionably establish* [the petitioner's] innocence." *Id.* at 317 (emphasis added). Over ten years later, and long after AEDPA's enactment, the Supreme Court in *House* finally reasoned that the "sequence of the Court's decisions in *Herrera* and *Schlup* – first leaving unresolved the status of freestanding claims and then establishing the gateway standard – implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*." *House*, 547 U.S. at 555.

Like *Herrera, Schlup*, and *House*, the district court did not put a name to the standard of proof it applied to Jimenez's actual innocence claim. It concluded that cases following *Herrera* that had come close to recognizing a freestanding innocence right did so only with respect to capital cases. *Jimenez III*, 560 F. Supp. 3d at 769. But the district court set that distinction aside and reasoned that, at minimum, a habeas petitioner must supply an even greater quantum of proof of his innocence than what is required to demonstrate gateway innocence. *Id.* On that understanding, the district court concluded that Jimenez had not met that threshold under the deference owed to the State court's reasoning as required by

50

AEDPA. *Id.* at 770-72. Among other things, the court applied our analysis in

*Hyman* and reasoned that Jimenez ultimately had not shown that he did not do,

or could not have done, the crime because "[t]he inconsistencies in Velazquez's

prior descriptions of the shooter . . . reduce the proper weight a juror might give

to her testimony but do not affirmatively show Jimenez's innocence." *Id.* at 772.

We agree with the district court, though we express no view of its

suggestion that a hypothetically lower standard of proof may be limited to actual

innocence claims in capital cases. *See id.* at 769-70. We affirm only that, as a

matter of law and as unequivocally set forth by the Supreme Court, the degree of

proof required to make out a freestanding claim of innocence (assuming that

such a claim is cognizable on habeas corpus even in a noncapital case) exceeds

the proof required to establish gateway innocence. *See House*, 547 U.S. at 554-55.

Jimenez's proof has not reached those heights. We need not identify the exact

degree of proof required because, as we have already described, the same body of

evidence that could, at most, only barely surmount the gateway innocence barrier

in this case logically "falls short" of the greater certainty demanded in

substantive innocence claims.[26] *Id.* at 555.

Jimenez resists that conclusion. He raises three objections to the perceived contradiction in the district court's decision that, even though he prevailed at the gateway innocence stage, he cannot do so at the merits stage.

He and his supporting *amici curiae* primarily argue that the district court's reliance on the *Hyman* criteria – holding Jimenez to the burden of proving that he "*did not* commit, or *could not* have committed" the murder, 927 F.3d at 665 (emphases in original) – improperly imposed an onerous standard beyond what *Herrera* demands by requiring him to affirmatively prove that it was *impossible* that he had killed Brana.[27] But, as Jimenez recognizes, *Hyman* did not require

[26] It is not clear, in any event, that creating a label for the degree of proof would be much help. Suppose, for example, we ruled that a habeas petitioner must establish his factual innocence "beyond a reasonable doubt," mirroring the standard by which the jury must be convinced of guilt in order to return a verdict against the defendant. That standard itself has proven extremely difficult to define in more concrete terms, *see In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, *J.*, concurring), and it is not clear that the usual jury instructions do much to guide jurors beyond impressing them with the weightiness of their responsibility and the importance of reaching a very high degree of certainty before voting to convict, *see Victor v. Nebraska*, 511 U.S. 1, 5 (1994) ("Although [the beyond a reasonable doubt] standard is an ancient and honored aspect of our criminal justice system, it defies easy explication."). So too here.

[27] *Amici,* five organizations consisting of criminal defense attorneys, point to compelling statistics highlighting the scale of wrongful convictions as demonstrated by an accelerating rate of exonerations in recent years. We do not

petitioners to prove that their guilt was impossible; and as our discussion of the gateway innocence standard makes clear, *Hyman* described the type and effect of proof capable of making out a compelling claim of innocence to a lower degree of certainty. *See* 927 F.3d at 665. *Hyman* is distinguishable at the gateway innocence stage because Velazquez's identification was, by contrast to the evidence of guilt in that case, comparatively weak. But more than just comparatively weak incriminating evidence is required on the merits, and by concluding that "[e]vidence that merely cuts against the testimony of a state witness – even an important state witness – is not enough" to affirmatively demonstrate factual innocence under the heightened certainty required in a freestanding claim, the district court did not inappropriately apply *Hyman*'s rubric or require Jimenez to prove beyond *any* doubt that it was *impossible* for him to have killed Brana. *Jimenez III*, 560 F. Supp. 3d at 772.

Jimenez next argues that he has met the standard required to affirmatively

___

dispute *amici*'s contention that imperfect criminal procedures may ensnare the actually innocent in some cases. Nor do we dispute that the frequency of such cases may be higher than our precedents presume. Our jurisprudence, however, presupposes that a freestanding innocence claim might one day exist under sufficiently persuasive circumstances, *see Herrera*, 506 U.S. at 417, and neither Jimenez nor *amici* have demonstrated that those circumstances are present here.

prove his innocence because he has shown that it is likely that no reasonable juror would convict him in light of Ramos's recantation and the Alibi Witnesses' testimonies. That metric, however, reflects the less demanding gateway standard, which calls for an assessment of the probability that a rational jury would have acquitted him in a hypothetical trial in a manner akin to prejudice or harmless error standards in other constitutional claims.[28] *House*, 547 U.S. at 538. Such a hypothetical second trial, moreover, is not easily assessed. One can, of course, predict that a trial without Ramos (or with a fatally impeached Ramos) and with the two Alibi Witnesses would present a difficult road for a prosecutor relying solely on Velazquez's testimony. But we return to the essential problem: how do *we* weigh Velazquez's testimony? Even assuming she is available to testify, a witness who was believable when testifying a few years after the event will necessarily find it harder to recall details thirty years later. An effort to cobble

---

[28] *Schlup* stressed that the gateway standard is "by no means equivalent to the standard . . . that governs review of claims of insufficient evidence," 513 U.S. at 330 (internal citation omitted), but also stated that a compelling claim of gateway innocence demands "a stronger showing than that needed to establish prejudice" in a claim for ineffective assistance of counsel. *Id.* at 327. Due to that gradation in standards, in a subsequent appeal in *Rivas*, we reasoned that because we had previously found that the petitioner had made out a credible and compelling claim of gateway innocence, it followed that his trial counsel's errors were also prejudicial under *Strickland*. *Rivas v. Fischer*, 780 F.3d 529, 550-51 (2d Cir. 2015).

together a hypothetical trial that weighs the credibility of Velazquez's *original* testimony, which none of us saw in person, against the putative *future* testimony of the Alibi Witnesses (whom we have also not seen testify), is an inherently problematic exercise. *Herrera, Schlup,* and *House,* by contrast, are clear that demonstrating freestanding innocence calls for more than a sheer probability that a new trial, proceeding under impossible real-world conditions, would likely end in acquittal. *House,* 547 U.S. at 554-55; *see also Herrera,* 506 U.S. at 403 (rejecting a "probable innocence" standard that "would in effect require the State to retry [the] petitioner . . . simply because of a belief that in light of petitioner's new-found evidence a jury might find him not guilty at a second trial").

Jimenez and *amici* finally argue that a "clear and convincing evidence" standard of proof satisfies *Herrera*'s calling and should have been applied by the district court instead of its reliance on the *Hyman* criteria. "'[C]lear and convincing evidence' . . . means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir. 1985). The standard has also been more precisely defined as "plac[ing] in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New*

*Mexico*, 467 U.S. 310, 316 (1984)*; see also Addington v. Texas*, 441 U.S. 418, 424 (1979) (observing that "clear and convincing evidence" is an "intermediate standard" of proof typically used in civil cases involving "quasi-criminal wrongdoing" and that it is used to "protect particularly important individual interests").

Jimenez and *amici* contend that *Herrera* logically requires habeas petitioners to prove their innocence only to a degree of certainty one step greater than the "preponderance of the evidence" standard applicable in habeas review of other constitutional claims.[29] We do not necessarily quarrel with that framing; it is clear to us that if a habeas court could ever grant relief on a freestanding innocence claim, such a claim would require *at least* clear and convincing evidence of actual innocence. Beyond that proposition, however, there is little authority for Jimenez's argument that clear and convincing proof of actual innocence is

---

[29] The premise of that argument is not self-evident. The Supreme Court has in some cases described gateway innocence as requiring a "*convincing* showing of actual innocence." *McQuiggin*, 569 U.S. at 386 (emphasis added); *see also Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (requiring a showing of "clear and convincing evidence" that no reasonable juror would have found the petitioner eligible for the death penalty to reach a death-row petitioner's defaulted claims). If the "compelling" prong of the gateway innocence test demands a degree of proof analogous to the "clear and convincing" standard of proof, any freestanding claim of actual innocence would necessarily demand even more certainty. *See House*, 547 U.S. at 554-55.

*enough.*[30] Nothing in the *Herrera* line of cases suggests that an intermediate

standard of proof meets its "extraordinarily high" standard. The closest the

Supreme Court has come to suggesting a standard for a (still, to that Court,

hypothetical) claim of actual innocence is that a federal habeas court must be

convinced that the new evidence "unquestionably establish[es]" the petitioner's

innocence. *Schlup*, 513 U.S. at 317. By how much, if at all, that exceeds "clear and

---

[30] Jimenez and *amici* point to some district courts that have adopted a clear and convincing standard in freestanding actual innocence claims, in particular highlighting a formula adopted by the Georgia district court when it acted on the Supreme Court's instruction in *In re Davis* to find facts on the petitioner's innocence. *See* 557 U.S. at 952. That court described a sliding scale designed to identify a sufficient burden of proof based on its assessment of the strength of the underlying guilty verdict, and then assigned a "clear and convincing" standard to the petitioner's claim based on that scale. *In re Davis*, No. CV409-130, 2010 WL 3385081, at *43-45 (S.D. Ga. Aug. 24, 2010). No binding authority has adopted that test, however, and we decline to do so here because we need not fine-tune the hypothetical standard announced in *Herrera* in order to resolve the merits of Jimenez's innocence claim.

District courts in this Circuit have also speculated about more precise formulations of *Herrera*'s heightened freestanding innocence standard. Similarly, however, no case has actually applied those standards to grant habeas relief. *See, e.g., DiMattina v. United States*, 949 F. Supp. 2d 387, 414-22 (E.D.N.Y. 2013) (Weinstein, J.) (speculating that the petitioner's burden being "set higher than the *Schlup* standard . . . may resemble the 'shock the conscience' threshold sometimes used to assess substantive due process claims"); *Sacco v. Greene*, No. 04 Civ. 2391 (CLB), 2007 WL 432966, at *4, *7 (S.D.N.Y. Jan. 30, 2007) (recognizing a freestanding claim of innocence and describing the standard of proof as "clear and convincing" without applying it to the petitioner's claim).

convincing" evidence is difficult to say.

Examples further afield of wrongful conviction claims also cut against any conclusion that clear and convincing evidence of innocence is sufficient to meet the threshold implied in *Herrera*. *See, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 336, 340 (1992) (contrasting innocence of the death penalty, which requires "clear and convincing" proof of innocence to excuse a death-row petitioner's defaulted claim, with the "prototypical example of 'actual innocence' . . . where the State has convicted the wrong person of the crime"). For instance, we have held that in habeas petitions by civil immigration detainees, the government must justify a civil immigration detention by clear and convincing evidence because "[t]he Supreme Court has consistently held the Government to a [higher] standard of proof . . . where liberty is at stake." *Velasco Lopez v. Decker*, 978 F.3d 842, 856 (2d Cir. 2020). But that is because the "necessary scope of [habeas] review and resulting relief in part depends upon the [procedural] rigor of any earlier proceeding," and "the most searching review" is called for when detention "occur[s] *without* the procedural protections required in courts of law." *Id.* at 850 (emphasis added) (internal quotation marks omitted), quoting *Boumediene v. Bush*, 553 U.S. 723, 781 (2008). Criminal adjudications, by contrast,

quintessentially require rigorous procedure, afford defendants maximum procedural protections, and hold the State to prove guilt beyond a reasonable doubt. *See id.* at 850-51; *cf. Addington,* 441 U.S. at 423-24 (explaining that "beyond a reasonable doubt" applies in criminal cases to protect defendants "by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment").

As a result, we cannot be sure that a clear and convincing standard of proof is appropriate in light of the uniquely powerful competing interests repeatedly emphasized by the Supreme Court. "The function of a standard of proof . . . is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication . . . [and] serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington,* 441 U.S. at 423 (internal quotation marks and citation omitted). While the truth of a habeas petitioner's ultimate guilt or innocence is undoubtedly of the highest importance, the Supreme Court has repeatedly admonished that a state's countervailing interests – the "need for finality" and avoiding the onerous burden of retrying stale cases – are also

important because "in state criminal proceedings the *trial* is the paramount event for determining the guilt or innocence of the defendant." *Herrera*, 506 U.S. at 416-17 (emphasis added); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) (declaring that habeas review involves an "intru[sion] on state sovereignty to a degree matched by few exercises of federal judicial authority"), quoting *Harris v. Reed*, 489 U.S. 255, 282 (1989) (Kennedy, *J.*, dissenting). Under those parameters and our own struggle to envision a clear result in a hypothetical retrial of this ambiguous case, we cannot – and do not – definitively say that proof of innocence by clear and convincing evidence strikes a "fair balance" that "allocate[s] the risk of error," *Addington*, 441 U.S. at 423, 431, between a convicted prisoner found guilty after a fair trial free of error, and the "special costs [imposed] on our federal system" by exercising our habeas authority to "override[] the States' core power to enforce criminal law," *Shinn v. Ramirez*, 596 U.S. 366, 376 (2022) (internal quotation marks omitted), quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

There may be a case that one day calls for such a definitive determination, but this is not that case. That is because, even accepting Jimenez's preferred burden of proof for the sake of argument, he has not demonstrated *his* innocence

by clear and convincing evidence. Accordingly, we have no need to decide whether petitioners' evidentiary burden in freestanding innocence claims requires clear and convincing evidence of actual innocence, or some higher standard, such as proof beyond a reasonable doubt. *See Herrera*, 506 U.S. at 416-19.

Indeed, this case perfectly illustrates how evidence of innocence can be both "compelling" under *Schlup,* yet fall short of demonstrating substantive innocence under *Herrera*. Ramos's recantation is not a model of clarity. Nor is Jimenez's exculpatory evidence, taken as a whole, clear and convincing proof of his innocence in light of the lingering uncertainty from Velazquez's incriminating identification. Faced with a body of evidence that generates uncertainty as between guilt and innocence, we cannot conclude that Jimenez's innocence has been demonstrated to a "*highly* probable" degree. *Colorado*, 467 U.S. at 317 (emphasis added).

Ramos's recantation, taken as true, is more confusing than strongly probative of Jimenez's innocence. Ramos now insists that he knew the shooter was Dominican based solely on his word choice, but that does not square with the information Ramos gave to police the day after the shooting, or with his trial

testimony that he knew that the shooter was Dominican because he recognized him as the man called "Monaguillo" with whom he was acquainted. Significantly, both Velazquez and Ramos testified at trial that they believed the shooter was Dominican for separate reasons: Velazquez because the shooter's compatriot spoke in a Dominican accent when taunting Brana, and Ramos because he had *seen* Monaguillo in the neighborhood "for about a year or two" prior to the shooting and knew him to be Dominican. App'x 352. Ramos's present-day testimony that he actually knew Monaguillo to be Dominican only because he heard the shooter say "mamaguevo" is inconsistent with his statement to police the day after the shooting that he *recognized* Monaguillo using his sight and recollection (rather than his ears) and that Jimenez's picture, selected from a photographic array, matched that recollection. Even if Detective Thompson improperly influenced that selection as Ramos alleged at the gateway innocence hearing, Ramos's recantation does not undermine Velazquez's independent identification of Jimenez in another photographic array later that same day.[31] Even in Ramos's telling, it was *his* undisputed story about

---

[31] There is no evidence in the record pointing to the possibility that Velazquez's selection from the photographic array had been improperly influenced by Detective Thompson or another officer. Absent a basis to think so in the record,

62

recognizing Monaguillo as the shooter that first led investigators to focus on Jimenez as the prime suspect only a day after Brana's killing.

Nothing in the record, moreover, convincingly supports the key premise of Ramos's recantation that, just because Jimenez is Puerto Rican – a trait that he and his counsel would have known distinguished him from the identifying features recounted by the eyewitnesses at trial – he would have never uttered a vulgarity used mainly by Dominicans. Both eyewitnesses agree that the shooter advanced on Brana in the company of at least one Dominican, and Delgado, one of Jimenez's alibi witnesses and close teenage friend, is also Dominican. Whatever Ramos's sincere beliefs about a lack of linguistic cross-pollination between Puerto Ricans and Dominicans in the Bronx, it is entirely possible that a Puerto Rican teenager fraternizing with Dominican neighbors might adopt a profanity from Dominican Spanish into his own manner of speaking.

The Alibi Witnesses leave us with the same nagging uncertainty. Technically, the only new *affirmative* evidence of innocence introduced in Jimenez's habeas petition is the alibi defense that his trial attorney never raised; Ramos's recantation, at most, reduces the total amount of *inculpatory* evidence.

we do not speculate that her selection from the photographic array was coerced.

But even that alibi fails to inspire confidence that Jimenez is clearly innocent. Hernandez admitted that both he and Jimenez had left the street corner from time to time. And even granting that Delgado sincerely believes, as he testified at the gateway innocence hearing, that Jimenez remained at the corner celebrating Hernandez's birthday for ten straight hours on a day when a group of at least eight teenagers "came and left" from that public street corner, we cannot afford his assertion that Jimenez never "left [his] line of sight," App'x 1222, significant weight in light of Hernandez's admission.

At the very least, the alibi only *contradicts* Velazquez's identification. It does not undermine her trial testimony that she had no doubt that she saw Jimenez, a stranger to her, shoot her husband. We reiterate that, while Velazquez's reliability as an eyewitness was impeached at trial, nothing in Ramos's recantation or the Alibi Witness testimonies "thoroughly" destroys the basis for her identification of Jimenez. *Rivas*, 687 F.3d at 543.

Rather, the main reason to view Velazquez's identification with suspicion is not that her multiple post-shooting descriptions, as recorded in the police report by Detective Coor, contradicted her description of the killer at trial. Instead, it is the fact that her *consistent* description that the killer had Jheri curls

64

bears little resemblance to Jimenez's recorded appearance in 1992. But even then, no evidence in the record, old or new, undermines Velazquez's uncoerced and close-in-time identification of Jimenez in the photographic array. She also consistently maintained at trial that, to the extent Detective Coor's testimony that she had given him two descriptions of two different men in the post-shooting interview conflicted with her own recollection, she simply had not described the harasser to the detectives (or even looked at him), allowing the fair inference that it was not Velazquez's initial description that was mistaken, but Detective Coor's record of her statements.[32] In other words, even if Velazquez was not the *most* credible eyewitness, she was not a *noncredible* eyewitness.

That remaining thread of incriminating evidence is enough to cause Jimenez's innocence case to fall short of the threshold implied in *Herrera*. The freestanding innocence standard does not require petitioners to eliminate all doubt of their guilt. But the facts of this case illustrate that it requires more than an affirmative demonstration of mere reasonable doubt, or even of "considerable

---

[32] That is a reasonable inference given Detective Coor's testimony at trial that Detective Thompson had separately noted down a slightly different description of the shooter from Velazquez while Detective Coor was still interviewing her, not for the purpose of the report, but for the purpose of quickly disseminating it to other officers in the hopes of catching the shooter in the area.

doubt," *House*, 547 U.S. at 555, that Jimenez is guilty of the crime. Put another way, the innocence claim, assuming it is cognizable, does not require Jimenez to prove to an absolute certainty that he is innocent, or that he *could not* have committed the crime. It does, however, require a much higher degree of certainty than this record provides.

Whatever the exact descriptor applied, the standard for freestanding innocence is set above the already demanding requirements of gateway innocence. That is enough to conclude that Jimenez would not meet his burden even if his freestanding innocence claim is cognizable and the standard of proof is set at "clear and convincing evidence" of actual innocence. And it is more than enough to conclude that, even if we thought differently, we would not be at liberty to grant Jimenez relief under AEDPA.

### D. AEDPA

The foregoing discussion demonstrates that all that is clearly established in the law of freestanding innocence is the lack of clarity about the scope of any actual innocence right and the evidentiary burden necessary to demonstrate it. That brings us to AEDPA, the final barrier to both Jimenez's claim and to our own authority to decide differently. We cannot determine that the State court was

wrong to deny Jimenez's claim, because even if we could characterize the doubt

that Jimenez has cast on his guilt as sufficient to satisfy *Herrera*, the deferential

requirements of AEDPA all but foreclose the possibility of granting relief on such

a claim where there is little "clearly established [f]ederal law."[33] 28 U.S.C.

§ 2254(d)(1); *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (holding that

"[a]pplying a general standard [announced by the Supreme Court] to a specific

case can demand a substantial element of judgment," and that a state court has

"more leeway" in reaching adverse outcomes on the merits of a petitioner's

constitutional claims).

Section 2254(d)(1) of AEDPA prohibits courts from granting habeas relief

"where a petitioner's claim pursuant to . . . the U.S. Constitution[] has been

adjudicated on its merits in state court proceedings in a manner that is not

manifestly contrary to common sense." *Contreras v. Artus*, 778 F.3d 97, 106 (2d

---

[33] Typically, on habeas review, we look only to the holdings, not *dicta*, of Supreme Court decisions. *Contreras v. Artus*, 778 F.3d 97, 110 (2d Cir. 2015). Other than *House*, however, the relevant Supreme Court precedent on freestanding innocence supplies little but *dicta*, further restricting our ability to find that the AEDPA standard is met. The remainder of our discussion treats the Supreme Court *dicta* as if they were holdings to set the parameters of the State court's "leeway" to reasonably apply federal law in this case, *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), and concludes that even if the *dicta* in question were holdings, the AEDPA standard still would not be met.

Cir. 2015) (internal quotation marks omitted), quoting *Anderson v. Miller*, 346 F.3d 315, 324 (2d Cir. 2003). That review is extremely forgiving to State courts; federal courts must "extend considerable deference even to deficient reasoning [by the State court,] at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated." *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022) (internal citations, quotation marks, and alterations omitted). Section 2254(e)(1) of AEDPA also requires that federal habeas courts afford a presumption of correctness to a State court's factual determinations, "rebuttable only upon a showing of clear and convincing evidence of error." *Cosey*, 62 F.4th at 82-83. Habeas relief is therefore warranted "only 'where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents.'" *McCray*, 45 F.4th at 640 (alterations omitted), quoting *Harrington*, 562 U.S. at 102.

Deference is owed even if the State court does not supply any reasoning in support of its conclusion on the merits, or "cite or even [demonstrate] aware[ness] of [Supreme Court] cases under § 2254(d)." *Harrington*, 562 U.S. at 98. The State court in this case did more than the Supreme Court requires to trigger our deference under AEDPA; even as it applied standards of actual

innocence under a freestanding innocence claim as recognized under State law, it cited and applied the standards articulated by the Supreme Court in *Schlup* and *Herrera. Jimenez I*, 2015 WL 770457, at *3-4. Indeed, though the district court found that the State court's adverse credibility determinations had been rebutted by "clear and convincing evidence" as required by § 2254(e)(1), *Jimenez II*, 2018 WL 2768644, at *14, it concluded that the State court's "overall decision" on the merits of Jimenez's innocence claim – to which it applied a clear and convincing standard of proof – was not unreasonable under § 2254(d)(1) because that court "relied on federal precedents including *Herrera*" and alternatively reasoned that, "even if [Ramos and the Alibi Witnesses] were reliable, their accounts would not prove Jimenez's innocence under the demanding standard for a freestanding innocence claim," *Jimenez III*, 560 F. Supp. 3d at 770-71.

We find no fault in that reasoning. As already discussed, Jimenez has not supplied new evidence so powerful that it "unquestionably establish[es]" his innocence. *Schlup*, 513 U.S. at 317. Therefore, because the State court's analysis is not "so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated," *McCray*, 45 F.4th at 640 (internal quotation marks omitted), quoting *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001), we are compelled to

69

conclude that, on these facts, the district court simply could not have granted relief on Jimenez's actual innocence claim.

Jimenez does not contest the district court's conclusion that the State court did not misapply the law. *Jimenez III*, 560 F. Supp. 3d at 771. Instead, Jimenez argues that AEDPA does not apply to freestanding claims of actual innocence because that right, if it exists, is a fundamental constitutional right that requires petitioners to shoulder a heavier burden than required for other "arguably less fundamental" rights. Appellant's Br. 34. Therefore, innocence claims, which demand a "thorough inquiry for the truth above all," must not fall within AEDPA's ambit. *Id.* at 32.

There is no principled reason why AEDPA would not apply to freestanding actual innocence claims (presuming they exist) to the same extent it does to other types of alleged violations of the Constitution. As the district court reasoned, nothing in the text of § 2254(d)(1) or elsewhere in AEDPA indicates an intent to carve out an exception just for freestanding claims of actual innocence. *Jimenez III*, 560 F. Supp. 3d at 770. Nor is there language anywhere in the statute that supports applying Jimenez's proposed method of statutory interpretation: tethering AEDPA's scope to the standard of proof necessary to establish "less

fundamental" constitutional violations. Appellant's Br. 34. Absent any textual basis to do so, we are not at liberty to read an exception for innocence claims into the statute. *Cf. Jones v. Hendrix*, 599 U.S. 465, 477 (2023) (holding that a petitioner may not rely on AEDPA's saving clause to collaterally attack his federal conviction in a successive habeas petition even after the Supreme Court's changed interpretation of the statute of conviction likely rendered his conduct noncriminal).

Jimenez more expansively contends that AEDPA unconstitutionally restricts federal review of the merits of his innocence claim. He argues that, because innocence "cuts to the heart of the 'Great Writ,' which has historically been a mechanism to protect the wrongfully convicted from erroneous incarceration," Appellant's Br. 26, "logic suggests" that the deference mandated by AEDPA "improper[ly] interfere[s] with the truth/justice-seeking function" of habeas review. *Id.* at 32. To supply that logic, Jimenez points to *In re Davis*, a habeas petition in a capital case that the Court transferred to a Georgia district court with instructions to conduct factfinding on the petitioner's innocence. 557 U.S. 952, 952 (2009). Writing in concurrence, three Justices opined that even if AEDPA "applies in full, it is arguably unconstitutional to the extent it bars relief

for a death row inmate who has established his innocence." *Id.* at 953 (Stevens, *J.*,

concurring); *see also id.* at 953-54 ("Alternatively, the court may find in such a case

that [AEDPA's] text is satisfied, because decisions of this Court clearly support

the proposition that it 'would be an atrocious violation of our Constitution and

the principles upon which it is based' to execute an innocent person."), quoting *In*

*re Davis*, 565 F.3d 810, 830 (11th Cir. 2009) (Barkett, *J.*, dissenting).

That speculation about what is "arguably unconstitutional," *id.* at 953,

about AEDPA as applied to the availability of habeas relief in capital cases

provides no guidance here, in a noncapital case.[34] Moreover, AEDPA's

---

[34] Jimenez argues that the scope of any hypothetical innocence right is not limited to capital cases, citing our remarks in *Triestman v. United States*, which stated that it is "arguable . . . that the continued imprisonment of an actually innocent person would violate . . . a fundamental principle" of due process that is "rooted in the traditions and conscience of our people." 124 F.3d 361, 379 (2d Cir. 1997) (internal quotation marks and citation omitted), *abrogated by Jones*, 599 U.S. at 480-88. But *Triestman* avoided that constitutional issue by construing AEDPA's savings clause to permit hearing a successive habeas petition that would have otherwise been procedurally barred, reasoning that interpreting the statute to completely deny the petitioner of "an effective opportunity to raise his claim of actual innocence" would "imperil the constitutional validity of the AEDPA." *Id.* at 380. The Supreme Court, however, recently abrogated *Triestman*'s interpretation of AEDPA, and rejected the petitioner's arguments that constitutional peril resulted from a lack of opportunity to seek collateral relief. *Jones*, 599 U.S. 480-88.

At any rate, unlike the risk that no court could hear Triestman's claim, Jimenez has not been denied a forum as a result of AEDPA's procedural

requirement that federal courts presume that the factual findings of State courts are correct unless rebutted by clear and convincing evidence of error, 28 U.S.C. § 2254(e)(1), indisputably applies to the already well-recognized gateway innocence exception to AEDPA's procedural bars. *Cosey*, 62 F.4th at 82-83. That exception is "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U.S. at 404, quoting *McCleskey v. Zant*, 499 U.S. 467, 502 (1991). We do not see how § 2254(e)(1) can compel a form of deference to State courts at a less onerous threshold stage that allows a habeas petitioner to circumvent AEDPA's procedural bars, but § 2254(d) cannot require similar deference to the reasonable decisions of State courts on the more demanding, and more consequential, merits of a freestanding innocence claim.[35] Accordingly,

---

limitations, as the merits of his innocence claim have been heard in both State and federal court. He argues that the State court's decision did not count as a "full opportunity" to present his claim because it did not hold an evidentiary hearing, Appellant's Br. 33-34 n.9, but we need not decide whether that is so because even considering the record developed at the gateway innocence hearing, Jimenez has not established that he is innocent. So, the constitutional concerns raised in *Triestman* do not apply.

[35] Jimenez argues that if AEDPA indeed applies to the merits of his innocence claim, § 2254(e)(1)'s presumption of correctness does not apply where the State court failed to hold an evidentiary hearing and prevented adequate development

assuming cognizability *arguendo*, we hold that § 2254(d) of AEDPA constrains

federal courts' review of freestanding claims of actual innocence.

     *E.     Reasonableness of the State Court's Decision*

     Jimenez finally argues that even applying AEDPA deference and an

extraordinarily heavy burden of proof, the State court "unreasonabl[y]

determin[ed] the facts" because its failure to hold an evidentiary hearing resulted

in an incomplete development of the record supporting Jimenez's innocence.[36] 28

---

of the record facts. That raises an unsettled question we need not answer because the district court did not apply § 2254(e)(1)'s presumption of correctness to the merits of Jimenez's innocence claim, and even assumed *arguendo* that it could consider evidence from the gateway innocence hearing, yet it still found that Jimenez could not hurdle AEDPA deference under § 2254(d). *Jimenez III*, 560 F. Supp. 3d at 771. We agree with the district court's conclusion based on the same assumptions.

[36] We have never judged a State court's failure to hold a hearing on newly discovered evidence of innocence to have resulted in an unreasonable determination of the facts under AEDPA, although we have on one occasion suggested, in a non-precedential order, that a New York State court's denial of a motion to vacate a conviction without holding a hearing could "result[] in a decision that was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Garcia v. Portuondo*, 104 F. App'x 776, 779-80 (2d Cir. 2004) (internal quotation marks omitted), quoting 28 U.S.C. § 2254(d)(2). In that case, however, we ultimately vacated the district court's decision to order a new trial. *Id.* at 780-81. For the sake of argument, we assume without deciding that a State court can exceed the bounds of AEDPA's deference to its factfinding under § 2254(d)(2) by failing to hold an evidentiary hearing. It makes no difference in this case because the State court's factual

U.S.C. § 2254(d)(2). Jimenez specifically attacks the basis for the State court's

factual conclusions on Ramos's recantation, the Alibi Witnesses, and the strength

of Velazquez's identification. Each of those attacks, however, fails for the same

reason: Jimenez contests the State court's credibility findings. To be sure, the

district court concluded that the State court's credibility determinations were

rebutted by clear and convincing evidence. But those determinations were not

"unreasonable determination[s] of the facts" under AEDPA, nor did the State

court "misapprehend[] or misstate[] material aspects of the record" or "ignore[]

highly probative and material evidence" in making those determinations. *Cardoza*

*v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013).

"Where '[r]easonable minds reviewing the record might disagree' as to the

relevant finding, that [disagreement] is not sufficient to supplant the state court's

factual determination." *Id.*, quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The

State court even assumed that Ramos and the Alibi Witnesses were credible, but

still concluded that their stories, taken together, did not show that it was "highly

probable that [Jimenez] is innocent"; instead, they "merely cast[] doubt" on

---

determinations are not unreasonable even if we account for the witness
testimony elicited at the gateway innocence hearing.

Jimenez's guilt and conflicted with Velazquez's identification. *Jimenez I*, 2015 WL 770457, at *8. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). As we have made clear, we are far from reaching a different conclusion than the ones the State court reached in this case.

Accordingly, the district court did not erroneously determine that AEDPA deference all but compelled it to deny habeas relief on the merits. Even though it disagreed with the State court for the purposes of gateway innocence, it could not characterize that court's conclusions on the weight of the evidence as unreasonable. And, because the district court did not find differently, it could not grant Jimenez relief on his substantive claim of actual innocence. *See Jimenez III*, 560 F. Supp. 3d at 771-72. Neither can we.

## II.    *Brady*

Jimenez is not entitled to habeas relief based on his standalone actual innocence claim, but because his untimely petition passed through the innocence gateway, he might still be entitled to relief if he can demonstrate that Detective Thompson tampered with Ramos's testimony just before he took the stand at

Jimenez's trial, and that that tampering was not disclosed to the defense, in violation of *Brady*. According to Ramos, Detective Thompson allegedly told him that Jimenez was Dominican, showed him a picture of Jimenez, and promised him "castles and treasure" if he identified Jimenez in the courtroom. App'x 1044. The State court denied that claim without extended analysis. *Jimenez I*, 2015 WL 770457, at *12-13. Jimenez therefore argues on appeal that the State court unreasonably applied *Brady* law to Detective Thompson's undisclosed interference with Ramos's courtroom identification because, he urges, knowledge of that conversation was favorable to the defense and would have impeached Ramos's identification of Jimenez at trial.[37]

As a threshold matter, Jimenez does not contest that § 2254(d) of AEDPA applies to his *Brady* claim, but unlike the latitude afforded to his hypothetical freestanding claim of actual innocence, here it is indisputable that "federal review

---

[37] The district court declined to consider a distinct witness tampering claim based on the same factual allegations underlying Jimenez's *Brady* claim because he had not exhausted that claim before the State court. *Jimenez III*, 560 F. Supp. 3d at 773, citing 28 U.S.C. § 2254(b). Jimenez does not argue on appeal that he had, in fact, exhausted his State remedies on a separate witness tampering claim. We therefore follow the example of the district court and decline to consider any distinct witness tampering claim. In any event, Ramos's claim that Thompson offered him "castles and treasure" to identify Jimenez as the killer is, on its face, the least credible aspect of his testimony.

under . . . § 2254(d)(1) 'is limited to the record that was before the state court that adjudicated the claim on the merits.'"[38] *Jackson v. Conway*, 763 F.3d 115, 135 (2d Cir. 2014), quoting *Cullen*, 563 U.S. at 181. Under those constraints, Jimenez has not demonstrated by a preponderance of the evidence that the State violated his right to disclosure of material exculpatory evidence by failing to turn over Detective Thompson's alleged statements to Ramos.

*Brady* held that "the government violates the Constitution's Due Process Clause 'if it withholds evidence that is favorable to the defense and material to

---

[38] Jimenez argues that the district court should have also considered Ramos's gateway hearing testimony when evaluating the *Brady* claim, instead of limiting itself to Ramos's affidavit. He inaptly relies on *Garner v. Lee*, which explained that federal courts are "not bar[red] . . . from holding an evidentiary hearing and considering evidence beyond the state court record when it engages in . . . non-§ 2254(d), *de novo* review" of whether a petitioner has demonstrated "by a preponderance of the evidence that his constitutional rights have been violated." 908 F.3d 845, 860 (2d Cir. 2018), quoting *Cardoza*, 731 F.3d at 178. Jimenez, however, erroneously bases his argument on the standard applied when a State court did *not* decide a petitioner's exhausted constitutional claims on the merits. Here, the State court *did* decide the issues on the merits. *Garner* held that a federal habeas court may order an evidentiary hearing to determine whether the petitioner has met his burden to prove a constitutional violation only if a state court dismissed his claim without any explanation or procedural basis. *Id.* By contrast, AEDPA prevents a federal court from "consider[ing] any evidence adduced from its evidentiary hearing in its § 2254(d)(1) analysis" of any claim that the State court *did* resolve on the merits. *Id.* The district court, therefore, did not erroneously disregard Ramos's gateway hearing testimony.

the defendant's guilt or punishment.'" *Turner v. United States*, 582 U.S. 313, 315 (2017) (emphasis omitted), quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012). The government has an affirmative duty to disclose favorable exculpatory evidence that would impeach the credibility of witnesses. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). To make out a *Brady* violation, a petitioner must show that material exculpatory or impeachment evidence was suppressed by the state, either willfully or inadvertently. *United States v. Bagley*, 473 U.S. 667, 674-75 (1985) (plurality opinion). "In other words, true *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial." *United States v. Hunter*, 32 F.4th 22, 31 (2d Cir. 2022).

The State court dismissed Jimenez's *Brady* claim on the basis that Detective Thompson's pre-testimony statement to Ramos was not exculpatory *Brady* material, but it did not identify whether it concluded as much because that conversation was not favorable, not suppressed, or not prejudicial. *See Jimenez I*, 2015 WL 770457, at *13. The district court, in turn, concluded that the State court's conclusion was supportable for three independently sufficient reasons. *Jimenez III*, 560 F. Supp. 3d at 773-74. One of those reasons was that "fairminded jurists could disagree over whether the Ramos affidavit identified any evidence

favorable to the defense that prosecutors wrongfully withheld" because the conversation as alleged in that affidavit had nothing to do with the basis for Ramos's identification as understood by all parties at the time of the trial: his recognition of "Monaguillo." *Id.* That conversation, if it occurred as Ramos alleged in his affidavit, also did not betray to Detective Thompson or any reasonable person in the detective's position that the *reason* Ramos hesitated to identify Jimenez was his belief that he was Dominican. *Id.* Because that reason is sufficient to conclude, as we do, that Jimenez has failed to demonstrate a clear *Brady* violation at his trial, we do not address his objections to the district court's other independently sufficient reasons.[39]

The allegedly improper encounter between Detective Thompson and Ramos was not favorable *Brady* material. Favorable impeachment evidence

---

[39] The district court identified two more reasons why Ramos's *Brady* claim is foreclosed. *Jimenez III*, 560 F. Supp. 3d at 773-74. First, the court concluded that Ramos's affidavit summary of his encounter with Detective Thompson was reasonably considered noncredible in the absence of the gateway innocence hearing testimony (which had expanded on the details of Detective Thompson's alleged influence on Ramos's courtroom identification). *Id.* at 773. The district court also reasoned that, even if the conversation had been favorable and suppressed, fairminded jurists could find that withholding it from the defense was not prejudicial because Ramos's reluctance to identify Jimenez at trial was plainly explored through examination at trial, and he had extensively testified to his belief that the shooter was Dominican. *Id.* at 774.

offered to discredit a witness – in this case, Ramos – includes evidence that could have significantly weakened his eyewitness account, undermined the "thoroughness and . . . good faith" of the police investigation, *Kyles v. Whitley*, 514 U.S. 419, 441-45 (1995), or "could have helped the defense suggest an alternative perpetrator," *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001). But in 1994, the fact that Ramos had based his identification of Jimenez on his mistaken belief that Jimenez was Dominican was, so far as his affidavit suggests, a private thought expressed to no one at the time. The content of his conversation with Detective Thompson demonstrates that none of the involved parties would have understood his queries as material to guilt or innocence that could have undermined the basis for his identification of Jimenez.

Ramos's affidavit describes only his internal narrative about why he considered information about Jimenez's ethnicity important. Ramos averred that he asked "because [Ramos] wanted to make sure that [Jimenez] was not Puerto Rican because [Ramos] knew that the person who killed [Brana] was Dominican," and that he "was still uncertain" as to the shooter's identity until Detective Thompson mistakenly told him that Jimenez was indeed Dominican, at which point he "thought that they had him" and "thought that [Jimenez] was the

one who killed [Brana]." App'x 67-68. Nowhere in Ramos's attestation is there any suggestion that Detective Thompson knew or should have understood from his questioning that the reason Ramos wanted to know whether Jimenez was Dominican or Puerto Rican was to allay his uncertainty about identifying the killer, as opposed to idle curiosity.

Certainly, the record does not reflect that *anyone* understood that Ramos hesitated to identify Jimenez, either at the lineup or in the courtroom, because he was unsure whether Jimenez was actually Dominican. Such an inference on Detective Thompson's part would have been remarkable. Jimenez's ethnicity was not the basis for Ramos's identification; it bears repeating that he told Detective Thompson the day after the murder that he knew the shooter's identity because he *recognized* Monaguillo. Thus, even assuming that Detective Thompson's allegedly influential statement to Ramos was said at all, that it was material to the case, and that its withholding was prejudicial to the defense, it was not favorable *Brady* material at the time it was made. At the very least, under the forgiving standards of § 2254(d), it was not such clearly favorable *Brady* material that the State court's determination runs afoul of clearly established federal law.

In summary, the content of the conversation between Detective Thompson

82

and Ramos would not have clearly signaled to either the defense or the State that Ramos was reluctant to identify Jimenez *only due to* his uncertainty about Jimenez's ethnicity. Because a fair jurist could reasonably reach the conclusion that Jimenez had not demonstrated a *Brady* violation, the State court's terse reasoning in denying that claim is not "so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated." *McCray*, 45 F.4th at 640 (internal quotation marks omitted), quoting *Cruz*, 255 F.3d at 86.

We are unpersuaded by Jimenez's counterarguments on appeal. He argues that the State court misapplied clearly established law by failing to recognize that Detective Thompson's undisclosed conversation with Ramos falls into certain broad categories of types of favorable *Brady* material: evidence that undermines the reliability of Ramos's trial identification of Jimenez, *Smith*, 565 U.S. at 76, and evidence that discredits the quality of the police investigation, *Kyles*, 514 U.S. at 441-45. But those are categories that have been found sufficiently favorable to defendants under case-specific sets of facts. *See Yarborough*, 541 U.S. at 664 (state courts have "more leeway" in "[a]pplying a general standard to a specific case"). On the unique facts of this case, it is certainly within the range of reasonable application of the law and facts for the State court to have concluded that

Detective Thompson's putative incorrect statement to Ramos that Jimenez was Dominican was both incidental to the central inculpatory facts presented at trial, and not recognizable as the type of impeachment evidence prohibited by clearly established law.

Jimenez finally argues that the State court unreasonably found as a matter of fact that Ramos's affidavit was noncredible, because Ramos's multiple explanations for his identification of the killer were not incompatible with each other. The State court's credibility determinations on this front are not unreasonable. A fair jurist reviewing only Ramos's affidavit could rationally find it difficult to reconcile his statements to police in the immediate aftermath of the murder and his trial testimony about recognizing Monaguillo. As exhaustively explained, it is not obvious from the conversation recounted in the affidavit why Jimenez's ethnicity mattered to Ramos's identification, and it is doubly hard to see why it should have been obvious when all parties understood at the time that the reason Ramos identified Jimenez was because he recognized Monaguillo.[40]

---

[40] Indeed, defense counsel knew at the time of trial that Jimenez was Puerto Rican, not Dominican, and did not use that fact to impeach Ramos, presumably because nothing in Ramos's testimony, or anything in the record prior to Ramos's recantation, suggested that he had identified a person he thought was Dominican because of a Dominican word he heard the shooter say.

Therefore, the State court did not unreasonably depart from the facts in the record before it by viewing the allegations in Ramos's affidavit as "far-fetched." *Jimenez I*, 2015 WL 770457, at *8.

Under the forgiving analysis mandated by AEDPA, the State court did not unreasonably deny Jimenez's *Brady* claim as meritless.

## CONCLUSION

We remain troubled by the possibility that Jimenez is innocent of the crime for which he was convicted. But given the unsettled law of the Supreme Court and the deferential review required by AEDPA, being troubled is simply not enough. Even assuming, as the Supreme Court has never held, that clear and convincing evidence of actual innocence permits a grant of habeas corpus, Jimenez has not satisfied that standard, let alone shown that the State court's conclusion that he failed to meet that standard was unreasonable. Accordingly, and for the reasons set forth above, we AFFIRM the district court's judgment denying Jimenez's petition for a writ of habeas corpus.

JOSÉ A. CABRANES, *Circuit Judge*, concurring in the judgment:

I concur only in the judgment of the Court insofar as it holds that Jimenez

has not carried the burden of proving, under the standards set by the

Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, his actual

innocence—assuming that such a claim is cognizable—nor that the Government

withheld exculpatory evidence in violation of the Fourteenth Amendment's Due

Process Clause, *see Brady v. Maryland*, 373 U.S. 83 (1963).

1